UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS WELLS,

        Case No. 21-cv-11265

        Honorable Sean F. Cox
        United States District Court Judge

      Plaintiff,

v.

FARMINGTON PUBLIC SCHOOLS; and
ELLEN ELY, in her individual and official
capacities,

      Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is a deprivation of civil and constitutional rights case. Plaintiff, Marcus Wells ("Wells"), was a student at Farmington Central High School. On November 4, 2019, while in class, Wells and another student got into a verbal altercation that had the potential to escalate to a physical fight. Wells's teacher, Ellen Ely ("Ely") attempted to break up the fight. While deescalating the encounter, Ely placed her hand on Wells and called him the "n-word." Wells alleges that the November 4 incident and past behavior of Farmington Public Schools officials deprived him of his constitutional and civil rights. Wells further alleges that during the November 4 incident, Ely committed common law assault and intentional infliction of emotional distress.

1

This matter is before the Court on Defendant Ely's and Defendant FPS' Motions for Summary Judgment. The Motions have been fully briefed and a hearing was conducted on November 10, 2022, at 11 a.m.

For the reasons set forth below, Ely's Motion for Summary Judgment is **GRANTED**. The Court holds that 1); Ely is entitled to qualified immunity from the § 1983 equal protection and substantive due process claims brought against her; 2) that Wells has failed to create a material dispute of fact that Ely violated Wells's civil rights under Title VI of the Civil Rights Act of 1964 or Michigan's Elliot-Larsen Civil Rights Act; 3) that Ely is shielded from Wells's assault claim by state statute; and 4) that Wells offered insufficient evidence to sustain a claim for intentional infliction of emotional distress. All claims against Ely shall be dismissed.

Further, FPS' Motion for Summary Judgment is also **GRANTED**. The Court holds that Wells failed to create a dispute of material fact that FPS violated 1) Wells's equal protection rights under § 1983; 2) Wells's substantive due process rights under § 1983; 3) that FPS is liable under a § 1983 *Monell* theory of liability; and 4) that FPS violated Wells's civil rights under Title VI of the Civil Rights Act of 1964 or Michigan's Elliot-Larsen Civil Rights Act. All claims against FPS shall be dismissed.

## BACKGROUND

### A. Procedural Background

On May 27, 2021, Wells filed this action against Farmington Public Schools ("FPS") in its official capacity, and Ely in her personal and official capacity. [1] (Compl., ECF No. 1). This

---

[1] An official-capacity suit is to be treated as a suit against the entity. *Brandon v. Holt,* 469 U.S., 464, 471–47 (1985). The real party in interest is the entity. "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105,

Court has proper federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

Wells's complaint contains the following 7 counts: 1) a claim against FPS and Ely for compensatory damages under 42 U.S.C. § 1983 for violation of Wells's equal protection rights; 2) a claim against FPS and Ely for compensatory damages under 42 U.S.C. § 1983 for violation of Wells's substantive due process rights; 3) a 42 U.S.C. § 1983 *Monell* claim for compensatory damages against FPS; 4) a claim against FPS and Ely for deprivation of Wells's civil rights under Title VI of the Civil Rights Act of 1964; 5) a claim against FPS and Ely for violation of Michigan's Elliot-Larsen Civil Rights Act; 6) an assault claim against Ely; and 7) an intentional infliction of emotional distress claim against Ely.

On Aug. 12, 2022, FPS filed a Motion for Summary Judgment. (FPS' Mot. Summ. J., ECF No. 40). On Aug. 15, 2022, Ely filed a Motion for Summary Judgment. (Ely's Mot. Summ. J., ECF No. 42).

With respect to summary judgment motions, this Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

---

87 L. Ed. 2d 114 (1985). Therefore, claims against Ely in her official capacity and claims against FPS are redundant. All discussion of claims against Ely focus on her personal capacity. All official capacity claims are addressed when discussing FPS.

c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 3, ECF No. 12). All parties complied with the Court's practice guidelines for summary judgment motions.

**B. Factual Background — Ely's Motion**

Ely worked as a teacher at FPS for approximately 10 years prior to the incident. (Ely statement ¶ 2); (Ely Counterstatement ¶ 2). Ely taught math at Farmington Central High School. (Ely statement ¶ 3); (Ely Counterstatement ¶ 3). Farmington Central is an alternative high school that provides support for students with behavioral issues. (Ely Statement ¶ 11); (Ely Counterstatement ¶ 11).

At all times relevant to this case, Wells was a student in the FPS system. During his time at FPS, Wells was punished on at least 24 occasions. (Ely Statement ¶ 9); (Ely Counterstatement ¶ 9). Wells's record includes punishment for disruptive behavior, sexual harassment, and theft. (Ely's Mot. Summ. J., Ex. 6 (Discipline Record) ECF No. 42-7). However, most of Wells's disciplinary actions occurred while he was in middle school. *Id*.

In January 2019, Wells transferred to Farmington Hills Central High School for his second semester of tenth grade. Ely was Wells's homeroom and math teacher. (Ely statement ¶ 7); (Ely Counterstatement ¶ 7).

On November 4, 2019, Wells was in Ely's Geometry class. (Ely statement ¶ 15); (Ely Counterstatement ¶ 15). James Edwards, another teacher, was also present in the class to provide special education support to students. (Ely statement ¶ 16); (Ely Counterstatement ¶ 16). During class, Wells and another student started an altercation. (Ely statement ¶ 17); (Ely Counterstatement ¶ 17).

4

Wells testified that the other student threw a pencil at him and began to approach, which Wells took as a threat. (Wells Dep. 57:7-10, ECF No. 45-2). Wells further testified he was prepared to defend himself if the other student touched him. *Id*. Other students in class reported that Wells and the other student were getting ready to fight. (Ely statement ¶ 22); (Ely Counterstatement ¶ 22).

Ely testified that to stop the altercation, she walked towards Wells, called his name, and gently placed her left hand on his shoulder. (Ely Dep. 44:1-15, ECF No. 42-2). Wells testified, however, that Ely walked up to him, put her hand on him, and called him the "n-word" (Ely Counterstatement ¶ 25).[2]

Wells next asked Ely to remove her hand, so she did. (Ely statement ¶ 26); (Ely Counterstatement ¶ 26). Wells then reported Ely's use of the "n-word" to Farmington Central's Principal, David Reese. (Ely statement ¶ 31); (Ely Counterstatement ¶ 31). FPS subsequently launched an investigation, during which Ely initially denied calling Wells the "n-word." (Ely's Mot.  Summ. J., Ex. 9 (Investigation Report at 2) ECF No. 42-10).

Wells testified that he had never heard Ely make a racially derogatory comment to a student before the November 4 incident. (Ely Statement ¶ 30); (Ely Counterstatement ¶ 30). Wells further testified that the November 4 incident is the only time he had ever heard Ely say the "n-word" (Wells Dep. 52:22-25, ECF No. 42-5).

James Edwards, the other teacher in the room, also stated he had never heard Ely use racial slurs in the past. (Edwards Dep. 9:12-16, ECF No. 42-8). However, Ely admitted that she

---

[2] Solely for the purpose of this Motion, Ely concedes that she called Wells the "n-word" during the November 4. incident. (Ely's Mot.  Summ. J. 1, ECF No. 42). Multiple student reports also confirm she called Wells the "n-word." (Ely's Mot.  Summ. J., Ex. 8 (Student Reports) ECF No. 42-9).

has used the "n-word" in the context of "discussions amongst friends, colleagues, talking about the situation in the world or why students use the word to each other." (Ely Dep. 52:15-53:13, ECF No. 45-30).

After the November 4 incident, Ely was initially suspended for three days without pay, but that suspension was extended to fourteen days without pay because the district suspected she was being dishonest about calling Wells the "n-word." (Ely Dep. 157:25-158:1, 166:24-167:18, ECF No. 42-2). Ultimately, after six months, Ely resigned from employment with FPS pursuant to a separation agreement. (Ely statement ¶ 35); (Ely Counterstatement ¶ 35).

Wells never saw Ely again after the November 4 incident. (Ely statement ¶ 36); (Ely Counterstatement ¶ 36). Further, Wells did not return to Farmington Central because of the November 4 incident. (Ely statement ¶ 37); (Ely Counterstatement ¶ 37). Instead, Wells finished high school at Oak Park Virtual Academy, where his grades improved marginally. (Ely's Mot. Summ. J. Ex. 5 (Transcript), ECF No. 42-6).

### C.  Factual Background — FPS' Motion

FPS' "Statement of Facts not in Dispute" largely focuses on FPS' policies and trainings, the adequacy of FPS' investigation after the November 4 incident, and discrediting evidence favorable to Wells. To the extent FPS' counter statement focuses on the November 4 incident, FPS' Statement and Wells's Counterstatement closely mirror the events described above, in Section B. FPS' Statement and Wells's Counterstatement, as they relate to the adequacy of FPS' policies, the resolution of the November 4 incident, and the viability of Wells's purported evidence, are addressed in the analysis section.

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

Further, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . .." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). "In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true . . .." *Id.* (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

## ANALYSIS

Ely asks this Court to rule in her favor and grant summary judgment on all six claims against her: 1) a claim violation of Wells's equal protection rights under 42 U.S.C. § 1983; 2) a claim for violation of Wells's substantive due process rights under 42 U.S.C. § 1983; 3) a claim for racial discrimination in violation of Title VI of the 1964 Civil Rights Act; 4) a claim for racial discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act; 5) a claim for assault; and 6) a claim for intentional infliction of emotional distress.

FPS asks this Court to rule in its favor and grant summary judgment on all five claims against it: 1) a claim for violation of Wells's equal protection rights under 42 U.S.C. § 1983; 2) a claim for violation of Wells's substantive due process rights under 42 U.S.C. § 1983; 3) a *Monell* claim for constitutional violations under 42 U.S.C. § 1983; 4) a claim for racial discrimination in violation of Title VI of the 1964 Civil Rights Act; and 5) a claim for racial discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act.

Ely's Motion for Summary Judgment is granted. Ely is entitled to qualified immunity from all § 1983 claims brought against her. Wells has failed to create a dispute of fact that Ely violated Wells's civil rights. Ely is shielded from assault liability by state statute. Lastly, Wells offered insufficient evidence to sustain a claim of intentional infliction of emotional distress.

FPS' Motion is also granted. Wells's equal protection, substantive due process, *Monell*, Title VI, and Elliot-Larsen Civil Rights Act claims are dismissed because Wells failed to create a dispute of material fact.

## I.     § 1983 14th Amendment Equal Protection Claims

Wells first alleges both Ely and FPS violated his 14th Amendment equal protection rights. (Compl. ¶ 36). Wells's equal protection claim against FPS cannot survive summary judgment because the evidence he produced to show that FPS intentionally discriminated is insufficient to create a material dispute of fact. Wells's equal protection claim against Ely also fails because she is entitled to qualified immunity.

### A.     FPS

Wells argues that FPS deprived him of his Fourteenth Amendment equal protection rights by discriminating against him based on his race and by creating a hostile educational

environment. (Compl. ¶ 31). Wells's argument fails because none of his proffered evidence shows similarly situated individuals punished differently based on race.

"The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws." *S.S. v. E. Ky. Univ.,* 532 F.3d 445, 457 (6th Cir. 2008). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Traditionally, the Equal Protection Clause reaches only state actors, but § 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 129 (2009).

To succeed on a § 1983 equal protection claim, a plaintiff must show the institution intentionally acted in a discriminatory manner. *Heyne v. Metro. Nashville Pub. Sch*., 655 F.3d 556, 571 (6th Cir. 2011). School officials violate the Equal Protection Clause when they punish a student more severely for his conduct than other similarly situated students because of the student's race. *Heyne v. Metro. Nashville Pub. Sch*., 655 F.3d 556, 570–71 (6th Cir. 2011).

As FPS correctly identified in its brief, this Court dismissed a factually similar equal protection claim in *Thorns v. Madison*. In *Thorns*, a large group of students of multiple races got into an altercation. After the fight, two black students received 180-day suspensions, while a group of white students did not receive such a severe penalty. *Thorns v. Madison Dist. Pub. Sch.*, No. 06-10674, 2007 WL 1647889 at 1* (E.D. Mich. June 5, 2007).

The black students alleged they were punished more harshly than other students because of their race in violation of their equal protection rights. *Id*. At summary judgment, this Court

held that the black students' equal protection claim failed because the white students who received less severe suspensions were not similarly situated. *Id*. at 5.

This Court held the students were not similarly situated because the black students were "implicated by nearly every witness with no exculpatory evidence." On the contrary, one white student transferred, so he could no longer be punished; one white student was not punished more severely because the evidence of his involvement was inconclusive; and one white student was not punished because the evidence showed he was not involved in the fight. *Id*. at 6.

Like the students in *Thorns*, the evidence Wells offered is insufficient to create a triable issue of fact. Wells cites suspension statistics within FPS, offers evidence of his own history of discipline within FPS, and offers testimony from former FPS employees to show that black students were being punished more severely based on race. For the reasons discussed below, Wells's evidence is insufficient to survive summary judgment.

### i. Suspension Data

Wells first argues FPS' suspension statistics are evidence that white students are being punished less than black students because of their race. According Wells's statistics, black students are suspended or expelled twice as frequently as white students. In 2018-2019, 5.78% of black students at FPS were suspended, compared to just 2.83% of white students. (Pl.'s Compl. Ex. 1 (Suspension data) ECF No. 1-1).

The suspension data does not support Wells's equal protection claim for two reasons. First, FPS offered a race-neutral explanation for the discrepancy in suspension data. *See Watson v. City of Cleveland*, 202 F. App'x 844, 856 (6th Cir. 2006) (stating that in the equal protection context, a defendant can refute a plaintiff's evidence of intentional discrimination by offering race-neutral explanations under the Title VII *McDonnell Douglas* burden shifting framework).

According to Farmington Central's Principal, David Reese, Farmington Central's student population was about sixty percent black students. (FPS' Mot. Summ. J., Ex. 3, (Reese Dep. 42:1-46:17). Reese further stated that while he was principal, most fights in his building consisted of male black students fighting other male black students, and that he had never experienced a fight between exclusively white students. *Id*. Lastly, Reese stated that fighting was the only disciplinary action where black males at Farmington Central were suspended more than white students. *Id*. at 46.[3]

In other words, according to Principal Reese, black students were suspended more frequently at Farmington Central because they were caught breaking the rules more often, not because of their race. Reese's testimony offers a logical, race-neutral reason why black students at Farmington Central were suspended at a disproportionate rate.

Second, the statistical disparity in suspensions throughout the district, without additional evidence, cannot show that race was a motivating factor in any one incident encompassed in the data or that similarly situated students were treated differently based on race. *See Barnes v. GenCorp, Inc*., 896 F.2d 1457, 1469 (6th Cir.1990).

For example, in *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 341 (6th Cir. 2016), a black student filed an equal protection claim against her teacher. The student alleged the teacher repeatedly referred her to her school's committee for academic misconduct because of her race. *Id*. 336.  The teacher, who had a history of referring only black students to the misconduct committee, claimed all referrals with respect to this student were for a race-neutral reason — plagiarism. The teacher also offered evidence that the student was plagiarizing. *Id*. at 340.

---

[3] Principal Reese's testimony addresses the discrepancy at Farmington Central only.

To rebut the teacher's race neutral explanation for the unequal treatment of black students, the student offered an affidavit from a statistician. The affidavit stated that in the absence of race discrimination, the odds that a teacher, over a 20-year career, would refer only black students to the misconduct committee was "somewhere between 1 in 10,000 and 3 in 1,000." *Id.* at 340.

The court found the evidence unpersuasive, stating "evidence of a statistical disparity cannot demonstrate that race 'played a factor in any particular' referral." *Id*. at 341. The court also held that because the teacher offered a nondiscriminatory explanation that undercuts the importance of the student's statistical proof, the student could not establish an equal protection claim by referring to statistics alone. *Id*. at 341. Lastly, the court held that "absent a showing that [the teacher's] 'explanations are inherently suspect'… summary judgment is appropriate." *Id*. at 342.

Like in *Thompson*, Wells relies heavily on statistics, but offers no additional evidence to combat FPS' race neutral explanations or that shows a single instance of suspension encompassed in the statistics was motivated by race. Therefore, the statistical discrepancy in suspension data does not show similarly situated individuals were being punished more harshly because of race.

### ii.  Wells's Discipline

Next, Wells argues his own experience at Farmington Central is evidence that he was disciplined disproportionate to similarly situated white students. Wells claims that Ely repeatedly sent email complaints to Principal Reese about his behavior and did not do the same when white students acted in the same manner. (Pl.'s Resp. FPS' Mot. 4, ECF No. 47). Wells also claims his suspensions at FPS were evidence of disparate treatment based on race. *Id*.  Ely's email

12

complaints and Wells's suspensions are insufficient evidence to create a triable issue of fact with respect to disparate treatment based on race.

### a)   Ely's Email Complaints

Wells first argues that Ely "made multiple complaints regarding Plaintiff's conduct to the principal at Farmington Central High School but can't recall any instances where she complained to the principal about any white students misbehaving although she admitted that the White [sic] student's behavior was equal to that of the African American students at Farmington Central." (Pl.'s Resp. FPS' Mot. 4. ECF No. 47).[4]

Even assuming the "email complaints" constitute discipline, which is suspect, Wells's argument fails because the emails Ely sent to Principal Reese do not show similarly situated individuals were being punished disproportionately because of their race.

Wells offered no evidence that the email complaints Ely sent about Wells were unwarranted based on his behavior. Wells has further failed to offer evidence that a white student acting in the same manner as Wells was not reported to the principal. Ely's email complaints about Wells coupled with a statement that her white and black students generally behave the same is insufficient evidence to show that on a specific occasion, two students of different races were acting in a similar manner and received different punishments because of their race.

### b)   Wells's Suspensions

Next, Wells argues his suspensions violated his equal protection rights. Wells has been suspended three times. (FPS' Mot. Summ. J., Ex. 7 (disciplinary records at 9-10) ECF No. 40-8).

---

[4] Ely did testify that the behavior of the white and black students in her class was "fairly equal." (Ely Dep. 39:19, ECF No. 45-3).

None of Wells's suspensions constitute sufficient evidence of disparate treatment based on race to survive summary judgment.

In 2018, Wells was suspended for a fight, which he admitted was disruptive. (FPS' Mot. Summ. J., Ex. 5 (Wells Dep. 94:1-7) ECF No. 40-6). The 2018 suspension is unpersuasive because as Wells admits, his behavior warranted punishment.

On March 25, 2019, Wells was again suspended for "physical aggression." (FPS' Mot. Summ. J., Ex. 7 (disciplinary records at 9-10)). Wells testified that he was suspended after an altercation where he was assaulted by a white student. Wells claims he was forced to act in self-defense, he threw no punches, and he did not break any rules. (Pl.'s Resp. to FPS, Ex. 1, (Wells Dep. 154:6-155:17) ECF No. 47-2). Wells further testified that he felt like he was only suspended because Principal Reese felt like he had to because he suspended the white student. (Pl.'s Resp. to FPS, Ex. 1, (Wells Dep. 156:11-17)).

However, Wells also admits in his testimony that he was actively involved in the altercation. Wells testified that he took his shirt off, engaged in the altercation to try and save his friend, and put his hands on another student after the student "jacked [Wells] up to the door". *Id.* at 154:11-155:6.

Even if Wells feels he was treated unfairly, objectively, he was still involved in a fight. The punishment for fighting, as stated in FPS' handbook is suspension. (Positive Culture Handbook, ECF No. 40-3 at 26). Therefore, Wells, even though he was not the initial aggressor, was similarly situated with the other two students involved. FPS did not violate Wells's equal protection rights when received the same punishment as the other students. (Wells Dep. 156:20-25, ECF No. 40-6).

The final suspension, which stems from the November 4 incident, also does not indicate Wells was punished more harshly than similarly situated white students. Wells stated that on November 4, another black student threw a pencil at him, so he got up, removed his jacked, and approached the student while they both yelled at each other. (FPS' Mot. Summ. J. Ex. 5 (Wells Dep. 55:1-59:7)). He further stated that Ely intervened, placed her hand on Wells, and called him the "n-word." *Id*. Other than Ely's use of the "n-word," Wells admits that he was suspended because of his altercation with the other student. *Id*; (FPS' Mot. Summ. J. Ex. 2 (Positive Culture Handbook at 23-26) ECF No.40-3).

*Erve v. Henry Ford Cmty. Coll.*, No. 13-12608, 2014 WL 4705309 (E.D. Mich. Sept. 22, 2014) provides strong support that Ely's use of the "n-word," coupled with an otherwise race-neutral reason for punishment, was not an equal protection violation. In *Erve*, a black student applied for a medical assistant program at a community college and was denied. The student claimed the denial was discriminatory in violation of her equal protection rights. In support of this contention, she identified a racial slur made by an employee. *Id*. at 3.

However, the real reason the student was denied entrance to the program was because she refused to take a reading comprehension test required of all applicants. The court held:

> Even assuming, *arguendo,* that this comment was made, it had no bearing on the decision to deny the Plaintiff's admission to the program. Indeed, the reading assessment test-which the Plaintiff refused to take-was required of all applicants seeking admission to the program. In other words, the Plaintiff's application was never actually denied on the merits because she failed to satisfy the prerequisites to admission. Moreover, even if the Court were to construe [the employee's] comment as racially derogative, "offensive or insensitive stray statements are not enough to demonstrate direct evidence of intentional discriminatory motive."

*Erve*, WL 4705309, at 3 (internal citations removed).

The plaintiff in *Erve* is like Wells. In both scenarios, a student faced a negative outcome because of a race-neutral rule, even though a racial slur was made. In *Erve,* the student's equal

15

protection claim failed because even though an employee used a racial slur, the student's

admission was denied because of other objective measures (the reading test). Similarly, Wells's

suspension did not violate his equal protection rights because even though a racial slur was

directed at him, his suspension was due to other objective measures (an altercation that violated

the student handbook).

Wells argues *Erve* is distinguishable because the student in *Erve* was applying to college

and because the racial slur was not directed at the student but made as a general remark. (Pl.'s

Resp. to FPS' Mot. 4). Wells cites *Brooks v. Skinner*, a case from the Southern District of Ohio,

for the contention that racially based conduct by a teacher may have greater impact on a student

than the same conduct by a worker or another student. *Brooks v. Skinner*, 139 F. Supp. 3d 869,

885 (S.D Ohio 2015).

However, Wells failed to bring forth any binding authority standing for the same

contention and further failed to identify any caselaw where a court held that a single use of a

racial slur was sufficient evidence to overcome an otherwise objective reason for a punishment.

The November 4 incident was not an equal protection violation.

### iii. Other Testimony

Lastly, Wells offers testimonial evidence to show similarly situated white and black

students may be treated differently. This evidence is also unpersuasive. All the testimony Wells

offers discusses generalities and does not identify specific instances of similarly situated

individuals being punished disproportionately based on race.

For example, Wells offers an affidavit from Aaron Johnson, the assistant superintendent

of FPS from 2014-2020. Johnson stated that he witnessed numerous occasions of the district's

failure or refusal to enforce Board of Education Policies 8008 and 4004, which condemn

discrimination and harassment of any form, including based on race. (Pl.'s Resp. to FPS' Mot., Ex. 6 (Johnson Affidavit) ECF No. 47-7).

FPS did not rebut Johnson's affidavit. However, the affidavit does not identify any specific incidents where a student in a protected class was punished more harshly than a similarly situated non-protected student because of race.

Wells has failed to produce direct or circumstantial evidence creating a dispute of fact that similarly situated students in a protected class were being punished more severely than non-protected students. Therefore, Wells's equal protection claim against FPS is dismissed.

### B.    Ely

Wells also claims Ely, as an individual, violated his equal protection rights. Wells claims that Ely discriminated against him based on race and created a hostile educational environment. (Compl. ¶¶ 31-35). In response, Ely claims she is shielded from liability because she is entitled to qualified immunity. (Ely's Mot. Summ. J. 2, ECF No. 42).

Qualified immunity is an affirmative defense that shields defendants sued in their individual capacity from monetary liability. *Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997). When deciding if an official is entitled to qualified immunity, a court must consider two elements: 1) whether the officer has violated a constitutional right, and 2) whether the right was clearly established to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019).

If either inquiry is answered in the negative, then qualified immunity protects the officer. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015). The plaintiff bears the burden

of demonstrating a constitutional violation and that a clearly established right exists. *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020).

For qualified immunity analysis, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640 (2010).  Therefore, to show Ely is not entitled to qualified immunity, Wells must offer sufficient evidence that Ely's actions, without considering evidence concerning other actors, violated a constitutional right that was clearly established at the time of the violation.

### i.   Element One

Wells must first show that Ely's behavior alone violated his equal protection rights. In other words, Wells must produce sufficient evidence to show Ely punished Wells more harshly than other similarly situated students because of his race. Wells has not met his burden.

As discussed above, with respect to FPS, Ely's use of the "n-word" during the November 4 incident did not violate Wells's equal protection rights. Further, as discussed above, the "disciplinary" emails Ely sent to Principal Reese about Wells are also insufficient to show an equal protection violation.

Wells's argument that Ely created a hostile environment also fails. To sustain a hostile environment claim, Wells must show that he was subjected to harassment based on his race that was sufficiently severe or pervasive to alter the conditions of his education and create an abusive educational environment. *Williams v. CSX Transp. Co., Inc.*, 643 F3d 502, 510 (6th Cir. 2011).

Wells testified that prior to the November 4 incident, Ely treated him the same as everyone else. (Wells Dep. 148:17-22, ECF No. 40-6). Wells's admission alone is sufficient for the Court to find that there is no triable issue of fact. Ely did not create a sufficiently severe or pervasive environment to alter the conditions of Wells's education.

In Conclusion, Wells has offered insufficient evidence to show that Ely violated his equal protection rights by punishing him more severely than similarly situated individuals based on race. Wells has also offered insufficient evidence to show Ely created a hostile educational environment. Because Wells has failed to show his equal protection rights were violated, he fails the first element of qualified immunity analysis. Qualified immunity shields Ely from equal protection liability.

### ii.  Element Two

With respect to Ely, Wells makes one additional argument that "a student's interest 'in pursuing an education is included within the fourteenth amendment's [sic] protection of liberty and property.'" Wells's argument does not impact Ely's eligibility for qualified immunity.

Even if the Court were to find that Ely violated Wells's Fourteenth Amendment liberty and property protections, qualified immunity would still shield Ely from liability because Wells's right was not clearly established at the time of the incident.

When determining whether a right was clearly established, the question must be settled enough that "every reasonable official would have understood that what he is doing violates [the] right" at issue. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, existing precedent must exist that places the statutory or constitutional question beyond debate. *Id*. at 741.

Further, the existing precedent must be "particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017). The case "need not be on all fours" with the instant fact pattern to form the basis of a clearly established right. *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018). The case must only be "a fact pattern similar enough to have given fair and clear warning to officers about what the law requires." *Id*.

Wells has not offered a single case that is factually similar and binding. Instead, Wells makes the unsupported claim that "Defendant's assertion is disingenuous. Any reasonable person (teacher) would know that calling a black student [the "n-word'] in the open classroom is unlawful and that to do so would be a violation of Plaintiff's Constitutional [sic] and or statutorily protected rights." (Pl.'s Resp. to Ely's Mot. 7, ECF No. 45).

The only case Wells identified was *Brooks v. Skinner*, 139 F. Supp. 3d 869, 885 (S.D Ohio 2015). *Brooks* is non-binding and factually distinct. In *Brooks*, two biracial students were victims of racial harassment "on a daily basis." *Brooks*, 139 F. Supp. 3d at 874. The students were called a myriad of racial slurs including the "n-word" multiple times, by multiple students, over the course of multiple years, as well as two incidents where the school principal used racial slurs. *Id*. at 874-879.

The case at hand is distinct. The students in *Brooks* were subjected to multiple incidents of racism over multiple years by multiple people. The November 4 incident is the only time Wells had ever heard Ely say the "n-word." (Wells Dep. 52:22-25, ECF No. 42-5). Therefore, Wells has also failed to show that his Fourteenth Amendment liberty and property rights were clearly established at the time of the November 4 incident. Because Wells failed to show a clearly established constitutional rights was violated during the November 4 incident, Ely is entitled to qualified immunity.

## II.    § 1983 Substantive Due Process Claims

Wells next claims that FPS and Ely violated his substantive due process rights when Ely "assaulted" him during the November 4 incident. (Compl. ¶ 42). Wells has not produced sufficient evidence to show FPS or Ely violated his substantive due process rights.

The Due Process clause of Fourteenth Amendment has a procedural component and a substantive one; the two components are distinct from each other because each has different objectives and each imposes different constitutional limitations on government power. *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996). Here, Wells only raised a substantive due process claim.

Substantive due process serves the goal of preventing "governmental power from being 'used for purposes of oppression,'" regardless of the fairness of the procedures used. *See Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).

A substantive due process claim is different than a claim of assault or battery under state tort law. Substantive due process concerns violations of personal rights of privacy and bodily security. *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). To violate substantive due process in school corporal punishment cases, the force applied must cause injury so severe, and be so disproportionate to the need presented, and be so inspired by malice or sadism, rather than a merely careless or unwise excess of zeal, that it amounts to a brutal and inhumane abuse of official power literally shocking to the conscience. *Id*.

## A. FPS

Wells's brief hardly contains a due process argument. He recycles two paragraphs of the same facts used in his equal protection claim and cites no caselaw. Nonetheless, Wells alleges that FPS violated his due process rights because Ely's "assault" of him on November 4 was so egregious and outrageous that it "shocks the conscience." (Compl. ¶¶ 41-43).

During the November 4 incident, another student threw a pencil at Wells, so Wells got up, removed his jacket, and approached the student while they both yelled at each other. (FPS'

Mot. Summ. J. Ex. 5 (Wells Dep. 55:1-59:7)). Ely intervened, placed her hand on Wells, and called him the "n-word". *Id*.

The Sixth Circuit has never held that purely psychological bullying can suffice to shock the conscience. *See Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 680 (6th Cir. 2016) (stating "we have never said that purely psychological bullying can suffice to shock the conscience"). Based on the facts in this case, Ely's alleged "assault" of Wells on November 4 was purely psychological. Therefore, *Gohl* makes clear that Ely's alleged "assault" of Wells does not rise to a level that "shocks the conscience." There is no dispute of material fact. FPS did not deprive Wells of his substantive due process rights.

**B.     Ely**

Like with Wells's equal protection claim, Ely asserts that she is shielded from substantive due process liability because of qualified immunity. (Ely's Mot. Summ. J. 2, ECF No. 42). Ely is entitled to qualified immunity because Wells failed to produce sufficient evidence to show Ely violated his substantive due process rights.

As discussed above, to show Ely violated Wells's substantive due process rights, he must show her behavior was so severe that it "shocks the conscience." Wells offered the same evidence for his due process claim against Ely as his claim against FPS. *See* (Pl.'s Resp. FPS' Mot. 7); (Pl.'s Resp. Ely's Mot. 4). Therefore, the Court finds that Ely did not violate Wells's substantive due process rights for the same reasons as his claim against FPS. Because Ely did not violate Wells's constitutional right, she is entitled to qualified immunity.

### III.   § 1983 Monell Claim Against FPS

Wells next alleges that FPS violated his constitutional rights under the *Monell* theory of liability. (Compl. ¶ 47). Wells's *Monell* claim must be dismissed because there is no underlying constitutional violation.

The Supreme Court has approved municipal liability based on § 1983 when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where such actions emanate from informal governmental custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).

However, the Supreme Court has also repeatedly recognized that there can be no liability under *Monell* without an underlying constitutional violation. *Morris v. City of Detroit, Mich.*, 789 Fed. Appx. 516, 519 (6th Cir. 2019).

Here, as discussed above, Wells has offered insufficient evidence to show that FPS violated an underlying constitutional right. That is, Wells has not shown that FPS violated his equal protection rights or his substantive due process rights. Without an underlying constitutional violation, Wells has no basis to assert a *Monell* claim for liability. Therefore, Wells's claim must be dismissed.

### IV.   Title VI Claims

Wells also claims that FPS and Ely discriminated against him in violation of Title VI of the Civil Rights Act of 1964. Wells admits that his claim against Ely as an individual is improper. Wells's claim against FPS is also dismissed because he offered insufficient evidence to show intentional discrimination.

## A.  FPS

Wells alleges FPS violated Title VI because 1) Ely discriminated against Wells by intentionally calling him a racial slur and "assaulting him based on his race;" 2) because FPS had notice of Ely's discrimination and failed to take proper action; and 3) because black students are suspended at a disproportionate rate at FPS. (Compl. ¶¶ 57-61). Wells's Title VI claim fails for the same reason as his equal protection claim — there is insufficient evidence FPS intentionally discriminated based on race to create a triable issue of fact.

 As an initial matter, Wells's brief misstates the standard for a Title VI claim. Wells cites *Maislin v. Tennessee State Univ.*, 655 F. Supp. 2d 922 (M.D. Tenn. 2009), for the proposition that due to the similarities between Title IX and Title VI, "claims of deliberate indifference to student-on-student harassment or to a hostile environment are actionable under Title VI." (Pl.'s Resp. FPS' Mot. 12-13).

*Maislin* is non-binding and incorrect. Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." § 2000d, of Title VI, like Title VII "prohibits only intentional discrimination." *Alexander v. Sandoval,* 532 U.S. 275, 280 (2001) (citing *Alexander v. Choate,* 469 U.S. 287, 293 (1985)).

Wells also cites to *Williams v. Port Huron Sch. Dist.,* 455 F. App'x 612, 618 (6th Cir. 2012). Wells claims *Williams* illustrates the standard for a "deliberate indifference" claim under

Title VI. However, the standard Wells cites is in reference to a § 1983 claim. *Id*. The court in

*Williams* expressly declined to consider the plaintiff's Title VI claim. *Id*. at 621.

The proper standard to analyze a Title VI claim was stated by this Court in *Thorns.*

To avoid summary judgment on a claim under § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race. Plaintiffs must establish that Defendants intentionally discriminated against them, and the decision to suspend them from school was motivated by race and that race was a determining factor in the exclusion. Proof of discriminatory intent is critical. It follows that where the decisionmaker is motivated by a factor other than the excluded party's race, there can be no intentional discrimination." *Id.*

*Thorns v. Madison Dist. Pub. Sch.*, No. 06-10674, 2007 WL 1647889, at 7 (E.D. Mich. June

2007) (internal citations omitted).

To show intentional discrimination for a Title VI claim, a plaintiff may rely on direct or

circumstantial evidence. *Mitchell v. Toledo Hosp*., 964 F.2d 577, 580-81 (6th Cir. 1992). "Direct

evidence generally requires unmistakable verbal assertions that the plaintiff was treated

adversely because of his race. *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998);

*Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 507 (6th Cir. 2003). Where there is no direct

evidence, the analysis must proceed according to the *McDonnell* burden shifting framework

established by the Supreme Court. *Id*. at 508.

Under *McDonnell*, a plaintiff must first establish a prima facie case of discrimination. *Id*.;

*McDonnell v. Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once a plaintiff establishes

a prima facie case of discrimination, the burden of production then shifts to the defendant to

articulate some legitimate, nondiscriminatory reason for the defendant's action. *Brintley v. St.*

*Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 727 (E.D. Mich. 2012), *aff'd*, 545 F. App'x 484 (6th

Cir. 2013).

If the defendant carries this burden, the plaintiff must show that the legitimate reasons offered by the defendant were in fact a pretext for discrimination. *Id*. To make such a showing, a plaintiff must demonstrate that the defendant's proffered reasons 1) had no basis in fact; 2) did not actually motivate the decisions; or 3) were insufficient to warrant the decisions. *Drews v. Berrien County*, 839 F. App'x 1010, 1012 (6th Cir. 2021) (citing *Chen*, 580 F.3d at 400).

For example, In *Buchanan v. City of Bolivar*, a black junior high school student was caught throwing a rock at his assistant principal's vehicle. As punishment, the student was given the choice of a ten-day suspension or attending an alternative school for ten days. The student chose to attend the alternative school. The student also filed a lawsuit, alleging his school violated Title VI. The court held the student failed to establish a genuine issue of material fact regarding intentional discrimination because the school submitted affidavits that race was not a factor in the disciplinary decisions. *Buchanan v. City of Bolivar, Tennessee,* 99 F.3d 1352, 1356-1357 (6th Cir. 1996).

The student then failed to rebut the school's non-discriminatory reasons for punishment by showing they were pretextual. The student's only response was to allege that he would have been treated differently if he were white. The court ruled that the plaintiff "must introduce more than allegations and conclusions such as these to create a genuine issue of material fact ... [the] plaintiff failed to introduce any evidence tending to prove that the defendants' reasons were a mere pretext." *Buchanan,* 99 F.3d at 1357.

Like the student in *Buchanan*, Wells has failed to meet his evidentiary burden. Even assuming arguendo that Wells established a prima facie case of intentional discrimination because of his prior suspensions, FPS has offered legitimate, non-discriminatory reasons for each of Wells's suspensions.

All three of Wells's suspensions while at Farmington Central were related to fights. (FPS' Mot. Summ. J., Ex. 7 (Discipline Records) ECF No. 40-8). According to the FPS student handbook, suspension is a punishment for fighting, regardless of race. (FPS' Mot. Summ. J., Ex. 2 (Positive Culture Handbook at 22-26) ECF No. 40-3).

Because FPS has offered a non-discriminatory explanation for Wells's suspensions, the burden of proof shifts back to Wells to show FPS' explanations were a pretext for discrimination. Wells did not meet his burden.

None of Wells's evidence contradicts the fact that all Wells's suspensions were punishment for fighting, as laid out in FPS' handbook. Even Ely's use of the "n-word," while very troubling, is insufficient to show FPS was motivated by race when suspending Wells. *See Paasewe*, 74 F. App'x 505, 508 (6th Cir. 2003) (holding racially derogatory, offensive, or insensitive stray statements are not enough to demonstrate direct evidence of intentional discriminatory motive).

In conclusion, FPS has offered legitimate, race-neutral explanations for the behavior Wells alleged was discriminatory — chiefly his suspensions. Wells failed to offer sufficient evidence that FPS' race-neutral explanations were pretext for discrimination. Therefore, under the *McDonnell* burden shifting framework, Wells's Title VI claim is fails.

### B.  Ely

Wells consented to the dismissal of his Title VI claim against Ely in her personal capacity. (Pl.'s Resp. to Ely's Mot. 8, ECF No. 45).

### V.    Elliot Larsen Civil Rights Act

Wells further claims that Ely and FPS discriminated against him in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") and that FPS is vicariously liable for the

"hostile educational environment" Ely created in her classroom. Wells has produced insufficient evidence for his ELCRA claims to survive summary judgment.

### A.  ELCRA Claims Against FPS and Ely

Wells claims Ely and FPS violated ELCRA for the same reasons they violated Title VI: 1) because Ely discriminated against Wells and created a hostile environment; 2) because FPS had knowledge and failed to respond to Ely's discriminatory behavior; and 3) because Wells, and other black students, were suspended at a disproportionate rate. (Compl. ¶¶ 66-70).

Wells alleges FPS and Ely violated two sections of ELCRA. Wells argues FPS and Ely violated Mich. Comp. Laws § 37.402(a), which states an educational institution shall not "[d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex."

Wells also argues FPS and Ely violated Mich. Comp. Laws § 37.2302(a), which states a person shall not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."

As this Court stated in *Thorns,* "analysis of a claim for racial discrimination under the ELCRA [] requires application of the Title VII burden shifting framework." *Thorns*, WL 1647889, at 9. Title VI and Title VII, as discussed above, use the same framework. *Id*. Therefore, Wells's ELCRA claims fail for the same reasons as his Title VI claims — because he offered insufficient evidence of intentional discrimination to create a triable issue of fact.

### B.  Hostile Educational Environment Claim Against FPS

Wells also alleges FPS is vicariously liable under the ELCRA for the "hostile educational environment" created by Ely. (Compl. ¶¶ 67-68). This claim too must fail because Wells has offered no evidence that FPS was on notice of the alleged "hostile educational environment" prior to the November 4 incident.

To show a hostile educational environment, Wells must establish 5 elements: 1) the student belonged to a protected group; 2) the student was subjected to communication or conduct on the basis of a protected characteristics; 3) the student was subjected to unwelcome conduct or communication; 4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the student's education or created an intimidating, hostile, or offensive environment; and 5) respondeat superior. *See Radtke v. Everett*, 442 Mich. 368, 382–83, 501 N.W.2d 155, 162 (1993).

Wells cannot satisfy element five. In his brief, Wells incorrectly attempts to show respondeat superior using general principles. (*See* Resp. FPS' Mot. 16). However, in the hostile environment context, respondeat superior liability can be imposed on an employer "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." *Chambers v. Trettco, Inc.,* 463 Mich. 297, 311 (2000); *Elezovic v. Ford Motor Co.,* 472 Mich. 697 N.W.2d 851 (2005).

Here, Wells has offered no evidence that FPS had notice Ely was creating a hostile environment. Prior to the November 4 incident, Principal Reese had never received a complaint about Ely engaging in discriminatory acts. (FPS' Mot. Summ. J., Ex. 3 (Reese Dep. 140:10-18). The FPS HR department had also never received a complaint of discrimination against Ely prior to the November 4 incident. (FPS' Mot. Summ. J., Ex. 4, (Danziger Dep. 168:20-169:8). Further,

immediately after the November 4 incident, Ely was suspended, she never had another

interaction with a student in her class, and ultimately lost her job. (FPS' Mot. Summ. J., Ex. 9

(Ely Dep. 164:19-23, 214:22-215:6).

The record contains no evidence showing that FPS had notice that Ely was creating a

hostile educational environment before the November 4 incident. Once FPS was put on notice,

they acted. Therefore, no triable issue of fact exists. Wells's hostile environment claim is

dismissed.

## VI.   Intentional Tort Claims Against Ely

Lastly, Wells alleges that during the November 4 incident, Ely committed 2 intentional

torts — assault and intentional infliction of emotional distress. The Court holds that Ely is

shielded from Wells's assault claim due to Mich. Comp. Laws § 380.1312 and that Wells's

intentional infliction of emotional distress claim fails as a matter of law.

### A.  Assault

Wells's assault claim is barred by Mich. Comp. Laws § 380.1312. § 380.1312 states, in

relevant part:

> (4) A person employed by or engaged as a volunteer or contractor by a local or
> intermediate school board or public school academy may use reasonable physical
> force upon a pupil as necessary to maintain order and control in a school or
> school-related setting for the purpose of providing an environment conducive to
> safety and learning. In maintaining that order and control, the person may use
> physical force upon a pupil as may be necessary for one or more of the following:
>
> > (a) To restrain or remove a pupil whose behavior is interfering with the
> > orderly exercise and performance of school district or public school academy
> > functions within a school or at a school-related activity, if that pupil has
> > refused to comply with a request to refrain from further disruptive acts.
> >
> > ****
> >
> > (d) To quell a disturbance that threatens physical injury to any person.
> >
> > ****

(5) A person employed by or engaged as a volunteer or contractor by a local or intermediate school board or public school academy who exercises necessary reasonable physical force upon a pupil, or upon another person of school age in a school-related setting, as described in subsection (4) is not liable in a civil action for damages arising from the use of that physical force.

§ 380.1312 plainly applies to the November 4 incident.

It is undisputed that Ely is a school employee. Further, the November 4 incident began as an altercation that interfered with the orderly exercise of Ely's classroom and threatened physical injury to students. Other students in the class in the class reported that Wells and the other student appeared ready to fight each other. (Ely's Mot. Summ. J., Ex. 8 (Student Statements)). Lastly, Ely used physical force to quell the disturbance — She placed her hand on Wells's shoulder. (Pl.'s Resp. to Ely's Mot., Ex.1 (Wells Dep. 58:14-21).

To the extent Ely used physical force, she is protected from an action for civil damages arising from that use of physical force because she was a school employee and attempted to quell a disruptive disturbance to maintain control of her classroom. *See* Mich. Comp. Laws § 380.1312 (4) & (5).

### B. Intentional Infliction of Emotional Distress

Additionally, Wells cannot make out a prima facie case for intentional infliction of emotional distress. To the extent the tort is recognized in Michigan, "a plaintiff must prove the following elements: '(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.'" *Hayley v. Allstate Ins. Co.,* 262 Mich. App. 571, 577, 686 N.W.2d 273, 276 (2004) (quoting *Graham v. Ford,* 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (1999)). Intentional infliction of emotional distress claims may be decided entirely on summary judgment as a matter of law. *Miller v. Currie*, 50 F.3d 373, 377–78 (6th Cir. 1995).

31

Wells's claim fails on the first element. Ely's actions were not extreme and outrageous. "[O]nly when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community'" will liability attach. *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321, 788 N.W.2d 679, 694 (2010).

The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, '[o]utrageous!'" *Graham v. Ford*, 237 Mich. App. 670, 674–75, 604 N.W.2d 713, 716 (1999). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to liability for intentional infliction of emotional distress. *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321, 788 N.W.2d 679, 694 (2010).

For example, in *McGrew v. Duncan*, Judge Hood held a police officer executing a search warrant did not commit intentional infliction of emotional distress against a property owner. During the search, the police officer handcuffed the homeowner and threw her on the ground. 333 F. Supp. 3d 730, 743 (E.D. Mich. 2018), *aff'd in part, appeal dismissed in part and remanded*, 937 F.3d 664 (6th Cir. 2019). While the homeowner was handcuffed on the ground, the police officer called her a "bitch," told her she "shouldn't be so fat" and told her, "if you don't shut your [f***ing] mouth I can blow your head off and nothing can be done." *Id*. Judge Hood held that "[w]hile [the officer's] conduct is reprehensible, it does not rise to the level of extreme and outrageous." *Id*.

If a police officer's forcible conduct and threats of murder are not sufficiently extreme and outrageous, then Ely's behavior on November 4 is also not sufficiently extreme and outrageous. Ely approached Wells, placed her hand on him, and called him the "n-word." (FPS'

Mot. Summ. J. Ex. 5 (Wells Dep. 55:1-59:7)). While reprehensible, Ely's conduct does not meet the threshold of extreme and outrageous. Therefore, Wells's intentional infliction of emotional distress claim is dismissed.

**CONCLUSION**

For the reasons stated above, **IT IS SO ORDERED** that Defendant Ellen Ely's Motion for Summary Judgment is **GRANTED**. All claims against Ely shall be dismissed. **IT IS FURTHER ORDERED** that Defendant Farmington Public Schools' Motion for Summary Judgment is **GRANTED**. All Claims against Farmington Public Schools shall be dismissed. **IT IS SO ORDERED.**

Dated: December 1, 2022

s/Sean F. Cox
Sean F. Cox
U. S. District Judge